# Patton, Appellant, *v.* Hooks.

*Ejectment—Boundaries—Division line—Adverse possession—Estoppel—Evidence.*

In an action of ejectment where the issue is to determine the location of a division line described in deeds in partition executed by the predecessors in title of plaintiff and defendant, the latter is entitled to have the case submitted to the jury on the question of

320, (1915).] Syllabus—Charge of Court below.

adverse possession, where there is evidence 'that shortly after the execution of the deeds, a fence had been constructed having reference to the division line, a part being along it, but not on it, and that for more than twenty-one years before the suit was brought the fence had been maintained, except during a short interval after it had been torn down by plaintiff, but almost immediately rebuilt by defendant. In such a case it is immaterial that plaintiff may have occasionally used a private road, a part of which was on the land in dispute; and in such a case the deeds in the line of title may be sent out with the jury.

In an.action of ejectment where the issue is the location of a division line described in deeds of partition executed by predecessors in title of plaintiff and defendant, and where it appears that the deeds had been recorded, and that plaintiff had in no way misled the defendant, it is reversible error for the court to charge in effect that the defendant's cultivation of the plaintiff's land without objection on the latter's part would estop him from asserting title to the property, if such cultivation had not continued for twenty-one years.

Argued May 11,, 1915. Appeal, No. 71, April T., 1915, by plaintiffs, from judgment of C. P. Armstrong Co., Sept. T., 1912, No. 34, on verdict for defendant in case of William P. Patton, et al., v. John Y. Hooks. Before RICE, P. J., ORLADY, HEAD, PORTER, HENDERSON, KEPHART and TREXLER, JJ. Reversed.

Ejectment for land in East Franklin Township. Before PAINTER, P. J.

The court charged in part as follows:

Robert Campbell, as shown by the testimony, died June 6, 1864, and he appears to have left to survive him, a widow, Phoebe, who afterwards married a man by the name of Russell, and I believe later on again married a man by the name of Montgomery, and also left two children, Sarah J. Campbell, and Esther A. Campbell, Esther A. appears to have changed her name to that of Diamond by marriage, and later on to Claypool.

The plaintiffs further show that these heirs of Robert Campbell, by a deed dated in 1884, conveyed to. Henry Myers 28 acres of this land. Some time prior to 1881,

and after the death of Robert Campbell, the heirs of Robert Campbell, his widow and two children, divided this tract of land of 109 acres and 67 perches into three, or possibly, four sections, but the fourth section at least does not enter into this title, being the northeastern corner of it. It seems to have been divided by one line running east and west, near the center, and cutting off 57 acres to the south. The upper half of it was divided again by a line running in a slightly northeastern direction. The eastern end of this upper half being the Patton land, and the western half, a portion of the Rebold land. This Patton portion contained 28 acres. We have a deed from the heirs of Robert Campbell to Henry Myers for this half of the upper end, dated September 29, 1884. Henry Myers transferred the same property, by deed dated July 16, 1885, to Thomas Patton. It appears from the testimony in the case, that Thomas Patton, after he acquired this title, died; I don't recall the date of his death, but you will remember it. Upon his dying intestate, the title to this property descended to his eight children. These children are all of age, and there are no deceased children, so that the eight children of Thomas Patton now own his interest, and are the plaintiffs in this case. It appears from the evidence in the case that the widow of Thomas Patton is dead, so that the entire title has passed to these plaintiffs.

That would vest the title to that 28 acres of land in these present plaintiffs, by means of these several conveyances, and by operation of the intestate laws of this Commonwealth, and they would be entitled to a verdict for the land as described in this suit, if there was nothing else in the case.

It seems that this land was divided, and if you will recollect the testimony, and the descriptions in the deeds, it appears that the upper half was divided from the lower half by a line running on a bearing of north 87 degrees west, and it was parallel to the south line of this whole tract of 109 acres. Now, the difficulty in the

320, (1915).]          Charge of Court below.

matter appears to arise in this way.   You will also re-
member, if you can recollect the data in that deed, that
the north line of the property transferred, first, to Mrs.
Russell by the heirs of Robert Campbell, and then later
to her son, and later to Hooks; that is, the north line,
and it is the line that is common to both tracts, being the
north line of Hooks' property, and the south line of the
Patton heirs property, and has the same bearing as ap-
pears in the deed from the Campbell heirs to Henry
Myers, the predecessor in title of Thomas Patton.   I
think you can safely start out in saying that at one time
that was a straight line running from the western bound-
ary of the Campbell farm to the eastern boundary.
[That you may understand, take the top of this desk,
here is the dividing line along here, this portion below
being the southern portion, is the property owned by
Hooks, and the property that would be above this, that
would represent the Patton property, and Rebold comes
in here, and is divided off by a line running a little in
that direction (indicating with his hand,) the length of
the line from the river end here to the western end here
to that stone corner, being the western end of the Patton
property, is 104 rods; I believe the right length is 156
rods, so that it is exactly two-thirds; so that for your
purposes, we can start with this point as two-thirds of
the distance from here to there (indicating).   Now when
the deed was made, which is the first deed for the part
taken from this Campbell tract, to Mrs. Russell, the line
began and ran on a straight line from the river to this
western boundary.   Later on this property was cut off
by a deed from the Campbell heirs to Myers, and the
bearing of this line on the Patton property, as I have
stated, was north 87 degrees west, and it carries the same
bearing as appears in the northern line of the Hooks
property, so that this line was a straight line at one time,
and was common to both properties.]    (10)

The plaintiffs offered to show that there was a stone
corner at this point, being the southwestern corner of

that property.    That you can take as proven, because it
is testified to by both sides of the case, as is also the fixed
monument at the extreme western end of that line at a
little distance, some 80 or 88 feet east from this corner
post, is another stone.    Just for what purpose that stone
was placed there we are unable to say, but there is some
testimony that it was put in in regard to some right-of-
way of Rebold, but you gentlemen, will recollect how
that was.

[The difficulty in this case arises from this fact.    The
surveyors who testified on behalf of the plaintiffs, started
their survey on that rock, and they made a calculation
from the bearing in the deed, which threw the line down
somewhat farther, from 28 to 32 feet.    You can look at
it this way, beginning at a stone up here, at a sharp
point, and running down this way to a stone, and then
running down 28 or 32 feet this way, making a wedged
shape piece of property like this (illustrating).    This is
the piece of property that is in dispute in this case.]
(11)

The first surveyor, Mr. Mast, did not run this line
through to the western corner, and when Mr. Lawson
was on the witness stand he testified that he afterwards
did run this line through, and upon projecting the line
through here found that this point along the bearing
that he was using was 18 feet north of that stone corner,
and the theory of the plaintiffs is, that that stone corner
is wrong, and that the point should be 18 feet north.    So
his line projected through the point, and this comes to a
stone which we have heard a good deal of talk about, as
the U. S. stone on the river bank.    You can readily un-
derstand that the more deflection there would be from the
line this way the greater amount of property there would
be taken off the Hooks farm here, it would also......
the line on the Rebold.    If, as the testimony of the de-
fendant goes to show, a line were projected from that
stone at the extreme western end, through this point,
then necessarily this line would be a straight line, and

must go to the river, or must reach a point further up the river than that found by Mr. Mast and Mr. Lawson. That is the theory of the surveyor of the defendant.

There is no dispute at the present time, that this line between Rebold and Patton is the correct line, but we are not concerned with that. [If the theory of the plaintiffs is correct, and their running of this line from the point here, back of the western corner of the Patton property, to a point reached at from 28 to 32 feet away from this point, then there must necessarily be, according to the testimony of Mr. Lawson, there must be a bend in the line instead of the line being a straight line, but that theory of the case, gentlemen, is a question for you. It is one of the questions, not the only question, but one of the questions for you to decide, just where that line is.] (12) [If, as I have stated to you, you find that the running of this line to that point on the bearing, as testified to by Mr. Lawson and Mr. Mast, reaches a point here at the rock on the Allegheny river, that one with the letters U. S. on it, then the Pattons, or the plaintiffs in this case, would be entitled to your verdict provided that the second theory of the defendant; that is, that of adverse possession for a sufficient length of time to entitle him to possession as against the plaintiffs, is disregarded by you. If, on the other hand, you find that the theory of the defendant, that the line originally being a straight line, and beginning at that extreme western end, at a rock, at a monument on that line and passing through this stone here, and reaching a point 28 to 32 feet above, then it would be for the defendant; that is, the defendant would be entitled to your verdict, if he has not estopped himself in any way from his claim to this land.] (13)

[There has been some talk of a draft made by Mr. Gray. That draft, unfortunately, is not before you, and the present surveys have been made from the bearings of the different deeds. We cannot say, and it is impossible to say, that the deeds were drawn from the bearings

actually made on the ground by Mr. Gray.   But you are
safe in starting out with the theory, that at a date, at
least as early as 1881, and later in 1885, when the deeds
were made to Russell and to Patton, this line was on a
bearing of north 87 degrees west, or south 87 degrees
west, which would be reversing the bearing, and that is
as far as the testimony goes.   The line has not been
changed by consent of any of the property owners.]   (14)
The bearings, however, differ, which has been accounted
for by the different surveyors on the stand, as being
caused by the variation in the needle.   We all are fa-
miliar with that theory, and that brings us to the im-
portant feature in this case, and it is covered by one of
the points on the part of the defendant in this case, and
that is this:  that where the marks on the ground on a
piece of property do not agree with the bearings given in
the deed, rather, the distance, and the variation of the
needle, then the bearings as described in the deed must
give way to the marks on the ground.   That principle is
very old, and it is a very proper one, and it has been sup-
ported by the higher courts many times.   The courts
have recognized the fact that mistakes may happen in
the deed through scrivener's fault, or there may be some
local attraction that affects the needle, and for other
reasons that have been from time to time advanced by
our courts.   It has become a theory that the fixed monu-
ments on the ground are supposed to be, and indeed are,
considered by our courts, to be the best means for locat-
ing the true and correct line in the survey of lands.

[Unfortunately, we do not have anything in this case
except a mark at the end, and the two stones here.   There
is some testimony that at one time there was a peg put
in through down near some laurel bushes at the river,
but you, gentlemen, will recollect what that testimony
was.   There is considerable testimony in regard to a
stone marked U. S., and also in regard to another large
stone or rock, as it was called, which lay in its natural
bed, exposed for some twelve feet.   This U. S. stone is

described to you by nearly all the witnesses as being about 3x4 feet exposed, and having the letters U. S. engraved on it, and a mark in between the letters.

You are men of experience in these matters, and you will have to decide whether that would be, under the testimony of the witnesses, whether that would be a stone which would be known as a corner stone. If that is the case, then you will have to reconcile some of the witnesses. The expert witnesses at least, are united in the fact that you cannot connect this U. S. stone with the middle and the stone corner, because they are not in a straight line. If you connect these two, you go on the Patton heirs sufficient to give to the Hooks farm all the property in dispute. If you disregard that stone, and start from here, and run from the middle stone to the U. S. stone, and project this line back, you not only make a crook in the line, but you take away from Rebold a portion of that property and you give to the Pattons all of the land north of that line, or some 28 or 30 feet down at the river. So you will have to reconcile the testimony as best you can, and say where the true line is.] (15)

There is another feature in this case, the defendant has set up title, that this line which runs on a bearing of north 87 degrees west, running from the river through these two stones, is the northern and true boundary of the Hooks property. If it is, as located by the survey of Mr. Aye, then it gives this land in question—if you find that this is the proper line—to the Hooks property, and then your verdict should be for the defendant. There is no evidence to that we recollect of, that there was any assertion of title to that property by the Pattons for any sufficient length of time to entitle them to the same. [In addition to that fact, in case you find that this line, as already testified to by Mr. Mast and by Mr. Lawson, is the correct line, and that the property as surveyed is within that line: that is, is north of that line, and between that line and the other property of the

328      PATTON, Appellant, v. HOOKS.

Patton heirs, to which there is no dispute, then they could not recover, unless you find that the second defense of the defendant does not avail him in this case; and that second defense is this: The defendant comes in and says that he is entitled to this property, in addition to his record title as shown for the reason that for a period of twenty-one years he has exercised exclusive, continuous, hostile and adverse possession over it.]   (16)

Now, that is one of the questions that you are to decide before this defendant can sustain his claim on this branch of the case; that is, J. Y. Hooks, to establish this branch of his case, must prove to you, by a preponderance of the testimony, that he and his predecessors in title, have had the actual, continued, uninterrupted, notorious, open, adverse and hostile possession of this property for upwards of twenty-one years, as provided by this act of assembly.  That is, in case you find that he has not, on the theory of his survey as to this line, made out his case, and that the line as surveyed for the plaintiffs by Mr. Lawson and Mr. Mast, embraces this land.  Even if you find the line to be as claimed by the plaintiffs, they could then not recover possession, nor be entitled to your verdict, unless you find against this second theory of the defendant.  If you refuse to adopt this theory as to the boundary line, which would give him the land in dispute, he still claims under the statute of limitations.]   (17)

[In addition to what we have said in relation to the statute of limitations, it is a well-known principle of law, and it is founded on good common sense, that if a man stands by and sees a stranger make valuable improvements on property that he claims title to, or that he owns, and does not interfere with him, or notify him to that effect, that he is then estopped from afterwards setting up claim of title to that particular piece of property.  For instance, if I own a lot, and my neighbor proceeds to put valuable improvements upon a portion of that lot, and I permit him to go ahead and make such

320, (1915).]   Charge of Court below—Opinion of Court below.

valuable improvements without stopping him, I would be estopped under the law from asserting against him any title whatsoever.  So in this case if you find from the testimony that the plaintiffs stood by and saw the defendant, Mr. Hooks, make such improvements of value, or make any improvements of value, in the way of buildings, or in the way of fruit trees, or in the cultivation of the land, without objection on their part, then they would be estopped from now asserting title to the property, by reason of their laches in that respect, and that need not be for a period of twenty-one years.]   (19)

Verdict and judgment for defendant.  Plaintiffs appealed.

*Errors assigned,* among others, were (10-19) portions of charge as above quoting them.

*C. E. Harrington,* with him *H. A. Heilman* and *J. H. Lawson,* for appellants.—Appellee did not show twenty-one years adverse possession in his predecessor.  In this essential his claim of title by statute was wanting. What constitutes adverse possession was for the court: Schwab v. Bickel, 11 Pa. Superior Ct. 312;  Hillside Coal & Iron Co. v. Zeigler, 218 Pa. 319.

The court erred on the question of estoppel: Knouff v. Thompson, 16 Pa. 357;  Wickham v. Twaddell, 25 Pa. Superior Ct. 188;  Hill v. Epley, 31 Pa. 331;  Logan v. Gardner, 136 Pa. 588;  Garvey v. Harbison-Walker Refractories Co., 213 Pa. 177.

*R. A. McCullough,* with him *R. L. Ralston,* for appellee.

OPINION BY HENDERSON, J., October 11, 1915:

The plaintiffs' action is for the recovery of a wedge of land about 1,700 feet in length with a base line of about thirty-five feet.  The controversy arises over the location of the division line between the farms of the plaintiffs

and defendant.    Evidence was offered to show that the defendant's occupancy overlapped the land of the plaintiffs to the extent described in the writ and that the true division line extended from a stone at the southwest corner of the farm of the plaintiffs to a point on the Allegheny river near a large stone having the letters "U. S." carved thereon.    The land of the plaintiffs and the defendant formerly belonged to Robert Campbell who died in 1864.    In 1881 his two daughters and his widow who inherited from him divided the land among themselves.    The south half of the farm was conveyed by the daughters to the widow on June 6, 1881, and by her to Ira Montgomery, December 23, 1890. The defendant acquired title from Montgomery by deed dated April 1, 1895.    That portion of the northern half of the farm involved in this action was conveyed by the daughters of Robert Campbell to Henry Myers, September 29, 1884, and by Myers to Thomas Patton, the father of the plaintiffs, July 16, 1885.    It is the location of the division line established when the heirs of Robert Campbell made partition among themselves about which the parties are contending.    This line was surveyed by S. B. Gray.    There is no question of interfering surveys nor allegation of defective title.    The appellee defended on three grounds: first, that he occupied to the line adopted in the division by the Campbell heirs; second, that he acquired title to the land within the enclosure of his fences by adverse possession; third, that his cultivation and improvement of the land in question for a long time with the knowledge of the plaintiffs worked an equitable estoppel.    The principal contention at the trial arose over the location of the Campbell division line, and the testimony offered raised an issue of fact as did also the testimony bearing on the question of adverse possession.    After having read the evidence with care in the light of the argument of the appellants we are unable to agree with their conclusion that there was not any competent evidence presented by the defendant to

support the claim of title by adverse possession. Very soon after the division made by the daughters and widow of Campbell a fence was built between the land now owned by the plaintiffs and that owned by the defendant. It was built with reference to the division line. The adjoining owners agreed to a separate construction of the fence, and a part of it at least was built along the line but not on it: The testimony tends to show that this fence remained for more than twenty-one years before the action of ejectment was brought except that at one time it was partly torn down by the plaintiffs and immediately rebuilt by the defendant. There is no evidence in the case, however, which would justify the conclusion that the occupancy of the defendant was so disturbed by the plaintiffs' attempt to remove the fence as to interrupt the defendant's possession, nor did the occasional use of the private road, a small portion of which it appears was on the land in dispute, give the plaintiffs such occupancy as to prevent the running of the statute; certainly not as to any part except that covered by the way. It is contended, however, that the defense of adverse possession fails because the defendant had only been in possession for about seventeen years; that it was necessary for him to connect his possession with that of his predecessor in title, Montgomery, and that the latter at the trial testified that during the time he occupied the land he did not claim any north or on the Patton side of the Gray survey. This is not an admission of Montgomery's, however, against the claim of the defendant who is insisting that the line to which he holds is the Gray line. Much of the evidence was introduced to show where that line was marked and each side stands for the same line but finds it in a different place. Under such circumstances the declaration of Montgomery that he did not claim north of the Gray line does not affect the validity of the defendant's claim that he occupied to the line established on the division of the Campbell estate. The witness testified that short-

ly after the survey he set stones where stakes had been placed by the surveyor and that these stones were on the line. The relation of these stones to the whole line had an important bearing in the case and the testimony of Montgomery clearly shows that he claimed to the line established by Gray. If that was the line found by the defendant's surveyor, Wm. Aye, the defendant's occupancy was the same as that of Montgomery and to the same line. Under such a state of facts the occupancy would be continuous.

By the defendant's second point which was affirmed as set forth in the ninth assignment and that part of the charge embraced in the nineteenth assignment the attention of the jury was directed to the subject of estoppel, and instruction was given that if the plaintiffs stood by and saw the defendant "make any improvements of value in the way of buildings or in the way of fruit trees or in the cultivation of the land without objection on their part then they would be estopped from now asserting title to the property by reason of their laches in that respect and that need not be for a period of twenty-one years." Under relevant circumstances there is no question as to the operation of equitable estoppel. The difficulty in this case is that the conditions did not exist which are necessary in order that it may apply. It is not alleged that the plaintiffs said or did anything to mislead the defendant to his prejudice. There was no encouragement by positive acts leading him to a course of conduct which he would not otherwise have adopted. At the most there was an omission to give notice of the plaintiff's claim. But there is a clear distinction between silence and affirmative encouragement. The latter may amount to a positive fraud; the former has no legal effect except where it is one's duty to speak, but this duty does not arise where the truth is known to the other party or where each party has equal means of knowledge. When an owner places his deed on record he gives the

information therein contained which every person is bound to take notice of: Knouff v. Thompson, 16 Pa. 357; Hill v. Epley, 31 Pa. 331; Wickham v. Twaddell, 25 Pa. Superior Ct. 188. The titles of the plaintiffs and the defendant were on record. Each of the parties had access to the grants from the Campbell heirs who created the division line; each had an opportunity from examination of the premises to ascertain where the line was. There was no misleading, therefore, nor suppression of the truth. The effect of the instruction complained of was to permit the jury to find that the cultivation of the plaintiffs' land without objection on their part would estop them from asserting title to the property, but under the facts as disclosed by the testimony there is no place for the application of the doctrine of estoppel. If the defendant cannot maintain his position by showing that the Gray line is that to which he holds or that his title is good by adverse possession his case cannot be made to stand on the doctrine of estoppel. It may be as stated by the appellee that the matter of estoppel was not an essential element in the determination of the case and in no way affected the real issue and that the defense on the other grounds was well established, but as the record comes before us the verdict of the jury may have been based on the failure of the plaintiffs to notify the defendant of their claim of title and the estoppel arising therefrom under the instruction of the court. The ninth and nineteenth assignments are therefore sustained. In the twentieth assignment complaint is made of the refusal of the court to allow the deed of Henry Myers and the deed of the Campbell heirs to him to be sent to the jury. We are unable to see that it was a matter of importance to the plaintiffs to have the jury inspect these documents, but no reason is shown why this request should not have been granted. They were conveyances in the line of title and it is customary to submit such papers to the jury: Riddlesburg Iron & Coal Co. v. Rodgers, 65 Pa. 416. We would not reverse on

this ground alone in view of the fact that the plaintiffs do not appear to have been prejudiced by the action of the court, but at another trial a similar request should be allowed.

There are thirty-eight assignments of error, some of them relating to incidents of the trial which will not occur again and need not therefore be considered. We have examined all of the assignments and are not convinced that any substantial error was committed by the court except in the respects referred to in this opinion.

The judgment is reversed with a venire facias de novo.